CLARK-KING CONSTRUCTION COMPANY, INC.
AND ANDRESEN v. SALTER
AND TAYLOR, TRUSTEES

[No. 69 (Adv.), September Term, 1973.]

*Decided July 20, 1973.*

The cause was argued before MURPHY, C. J., and BARNES, McWILLIAMS, SINGLEY, SMITH, DIGGES and LEVINE, JJ.

*Peter C. Andresen,* with whom was *David B. Lamb* on the brief, for appellants.

*Stephen R. Creyke,* with whom was *Leonard J. Williams* on the brief, for appellees.

BARNES, J., delivered the opinion of the Court.

In this appeal from a final order issued by the Circuit Court for Montgomery County (Miller, J.) on March 9, 1973, ratifying a foreclosure sale, the principal and decisive question involves the allocation of payments towards the debtor's obligations. One appellant, Clark-King Construction Company, Inc. (Clark-King), was the maker of a trust note secured by the deed of trust which was foreclosed. The other appellant, Peter C. Andresen (Andresen), was the holder of a junior lien. Both were exceptants below and contended that the note had been fully paid. The appellees trustees, James William Salter, III and Owen McDonald Taylor, contended that $14,000.00 remained due and owing on the trust note.

The relevant facts are somewhat involved but, for the most part, undisputed. On September 27, 1968, Clark-King

borrowed $24,000.00 from Arthur Dale Lumsden (Lumsden), giving as security for that loan a promissory note for $24,000.00 and a deed of trust of the same date, which imposed a lien upon 18 lots in Section 10 of a development in Montgomery County known as "Potomac Woods," recorded in Plat Book 83, Plat 8673 among the Land Records of Montgomery County. On the face of the note and the body of the deed of trust, itself, the 18 lots were described as being in Section 10 of the Potomac Woods subdivision and more specifically described as being:

"Lots 23, 24, 25, 26 in Block R
Lots 11, 12, 13, 14, 15, 16 in Block S
Lots 6, 7, 8, 9, 10, 11, 12, 13 in Block T."

The promissory note provided for interest at 7% per annum, payable on April 1 and October 1 in each year. The principal was payable two years after date "if not sooner paid." There was a provision in the note that if default was made of any amount becoming due under the note or the deed of trust, the entire principal sum and accrued interest should become due at the option of the holder of the note. The note contains a certification by the notary that the note is the one "described in, and secured by, a Deed of Trust of even date herewith" and was in the same principal amounts as stated to the named trustees, "said Deed of Trust being executed in my presence."

The deed of trust of September 27, 1968, is in the usual form used in Montgomery County. In addition, significantly, the trustees were directed by the noteholder to take the proper steps to effect a release of each of the lots from the operation of the deed of trust upon payment of $1,333 per lot to the noteholder and the note provided an allowance for all release fees. The usual affidavit of consideration was executed by Lumsden and Mr. Taylor, one of the trustees, certified that he was a member of the Maryland Bar and that the deed of trust was prepared under his supervision for signing and recording. The deed of trust was duly recorded on October 9, 1968, among the Land Records of Montgomery County in Liber 3797, folio 799.

On September 27, 1970, by written agreement, Lumsden extended the payment of the note to September 27, 1971. On June 4, 1971, Lumsden endorsed the note, without recourse, to the Madison National Bank (Madison).

As will be later shown, Clark-King paid Lumsden 10 payments of $1,333.00 each in exchange for partial releases of various lots and paid the interest on the loan to June 1, 1971. On June 1, 1971, Clark-King paid Lumsden $10,664.00, the balance of the note, in order to purchase back the note and to release all of the remaining lots. Lumsden, however, at the request of Clark-King, did not mark the note as cancelled and paid, but rather endorsed the note in blank, without recourse, even though the $10,664.00 check recited that it was for the release of the remaining lots. Clark-King then delivered the note to Madison as partial collateral security for a loan by Madison to Clark-King in the amount of $24,000.00. Apparently, Clark-King gave Madison a note for $24,000.00 for the June 1971 loan, but this note was never offered in evidence and the record is silent in regard to its date, term or any notations upon it.

Madison, on November 9, 1972, for a recited consideration of " $10.00, and other good and valuable consideration," assigned the note to Title Insurance Company of Minnesota (Title), without recourse to Madison; and on December 6, 1972, Title assigned the note, without recourse to it, to Floyd A. Meneely, using the same form as had been used in the assignment of November 9, 1972, from Madison to Title.

The trustees of the deed of trust on January 5, 1973, by Leonard J. Williams, Esquire, their attorney, filed an order in the lower court to docket a foreclosure suit, with the usual military affidavit, and an affidavit stating that $14,000.00 remained due and owing upon the $24,000.00 note. The original note of September 27, 1968, together with the extension agreement of September 27, 1970, and the assignments of November 9 and December 6, 1972, were filed as were an affidavit by Mr. Williams that notice of the foreclosure sale had been sent to Clark-King by registered mail as required by Maryland Rule W74 a 2 (b), and a copy

498

of a letter of December 29, 1972, with a registered receipt attached, and a copy of the advertisement of sale for January 8 of Lot 16 in Block S. A certified copy of the deed of trust was also filed. A corporate bond for $20,000.00 was filed and approved on January 5, 1973.

The Auctioneers' Report indicates that Lot 16, Block S was sold at public auction to Floyd A. Meneely for $5,000.00, subject to a first trust of $41,338.25, with interest from December 31, 1972 (which cannot be assumed) — a total of $46,338.25. Attached to the Auctioneers' Report were the terms of the sale as follows:

"The property will be sold subject to a first deed of trust held by ENTERPRISE FEDERAL SAVINGS & LOAN (now National Permanent Federal Savings & Loan Association), now in default as of 12/31/72 in the amount of $41,338.25 plus interest at the rate of $7^{1}/2\%$ from 1/1/73 and said deed of trust cannot be assumed. Therefore, every bid must be made on the basis that in addition to the amount of the bid there will be due $41,338.25 plus interest at $7^{1}/2\%$ from 1/1/73 on the first deed of trust. The property is not complete and is being sold 'As is' without any warranty. Taxes are unpaid in the amount of $814.91, and will be adjusted to date of sale. Among other uncompleted items: Kitchen cabinets are installed but damaged, no kitchen appliances are in the property, kitchen sink is not hooked up, no sinks or toilets are in bathrooms, no furnace or air-conditioning is included or installed, hardwood floors are not finished, tile floor in kitchen and one bath is not installed, walkout basement door is not installed or included, garage door is not installed or included, no electrical switches or fixtures are installed or included, neither grading nor sodding has been done."

The trustees, on January 9, 1973, filed their Report of Sale indicating that they "offer[ed] for sale the property

described in said deed of trust" and sold it to Floyd A. Meneely for $5,000.00 "and said sale was a fair one."

Meneely and wife had entered into a written contract of sale for Lot 16, Block S in the Potomac Woods subdivision on May 19, 1971, whereby they agreed to purchase that lot from Clark-King for $56,250.00 of which $11,250.00 was to be paid at settlement, subject to a first deed of trust of $45,000.00 (with interest at 7% per annum, payable at $318.06 a month over a 25-year period). Apparently, Mr. Meneely was willing to pay $7,000.00 for the assignment of the promissory note and deed of trust of September 27, 1968, with a view towards foreclosing the deed of trust and purchasing Lot 16, Block S at the foreclosure for a small amount. In fact, he was the purchaser at the foreclosure sale for $5,000.00, as we have indicated. Unfortunately for him, the promissory note had been fully paid by a proper allocation of payments by the debtor and there was, therefore, no default under the deed of trust which would justify the entry of foreclosure proceedings — all as we shall consider more fully in this opinion.

Clark-King and Andresen, on February 5, 1973, duly filed their exceptions to the foreclosure sale, alleging several grounds for setting aside the foreclosure sale. Among these grounds were:

1. There was no default justifying the sale, the promissory note having been "fully paid."

2. The advertisement of the foreclosure sale was defective in four respects.

3. The order *nisi* and advertisement of that order were defective and prejudicial to the exceptants in that they failed to mention that the property sold was sold subject to a first deed of trust.

4. The sale price was grossly inadequate.

5. The affidavit of indebtedness was "defective and fraudulent" in that it stated that the balance due on the note was $14,000.00 when in fact the note was fully paid.

Points and Authorities were duly filed with the exceptions.

The hearing on the exceptions was held on March 9, 1973. Judge Miller concluded — erroneously in our opinion — that inasmuch as no agreement in regard to the allocation of payments had been proved, *the creditor* had the right to allocate the payments — specifically considered — had been made by Madison to the unsecured note for $24,000.00, rather than to the secured note, so that the secured note of September 27, 1968, had not been paid in full and was in default. From his final order of March 9, 1973, ratifying the foreclosure sale, this appeal was timely taken by the exceptants.

In our opinion, the law is well established that in the absence of an agreement of the parties in regard to allocation of payments to a creditor holding two or more obligations of a debtor, *the debtor* has the original choice of allocation; and when the debtor makes an allocation of a payment, either expressly or by implication, the creditor must allocate that payment to the obligation indicated by the debtor. *See Safe Dep. & Tr. Co. v. Woodbridge*, 184 Md. 560, 42 A. 2d 231 (1945); *Fuqua v. Moody & Clary Co.*, 462 S.W.2d 321 (Tex. Civ. App. 1970). *See also Diplomat Electric, Inc. v. Westinghouse Electric Supply Co.*, 430 F. 2d 38 (5th Cir. 1970). *Cf. T. Dan Kolker, Inc. v. Shure*, 209 Md. 290, 121 A. 2d 233 (1956).

If no allocation is indicated by the debtor, then the creditor has the right to designate the application of the payment. If neither the debtor nor the creditor makes an allocation and if, as we have said, there is no agreement of the parties in regard to allocations, the law then makes the allocation to the oldest or the least secured obligations. *See Luksus v. United Pacific Insurance Co.*, 452 F. 2d 207 (7th Cir. 1971); *T. Dan Kolker, Inc. v. Shure, supra; Carozza v. Brannan*, 186 Md. 123, 46 A. 2d 198 (1946); *Neidig v. Whiteford*, 29 Md. 178 (1868).

As we have indicated, Judge Miller was erroneously of the opinion that in the absence of agreement of the parties, *the creditor*, rather than the debtor, had the right to apply the

payments. Counsel for the appellees argued to the same effect before us; but, as we have seen, this is an incorrect contention.

The resolution of the question of application of payments, therefore, turns on whether the debtor, Clark-King, effectively established that it designated its payments upon the note of September 27, 1968, resulting in its payment. We have concluded that it did establish, prima facie, such a designation of payments, which was not rebutted, and that the chancellor was clearly in error in not giving effect to the designated allocation of payments.

It should be observed that there is properly no contention made in this case that any of the holders of the note of September 27, 1968, are bona fide holders for value without notice so that any equities existing between the parties may be considered by the chancellor and by us.

We now turn to a consideration of the payments made by Clark-King and how they were treated at or about the time of the respective payments.

There was uncontradicted evidence that with each payment of $1,333.00 and later of $2,000.00, a partial release for a specific lot or for specific lots was tendered, and with one exception, executed, returned and recorded. On the face of the September 27, 1968, note itself, there are notations in ink that various lots had been "Paid." Apparently, as each payment was made, the respective lot numbers were circled and dated — sometimes with the word "Paid." In some instances, the check number and the amount "$1333.00" are given.

Several notations are dated prior to the June 4, 1971, endorsement by Lumsden to Madison:

*Block R*

Lot 23   "Paid June 9 - 69 - $1333.00"
Lot 24   "Paid Feb. 16, 70 - 4895"
Lot 25   "Paid Feb. 16, 70 - 181"
Lot 26   "Paid 10-17-69 $1333.00"

*Block S*

Lot 11 "Apr 21 70 Check 314"
Lot 12 "May 19 - 70"
Lot 13 "Paid 4-20-71"

*Block T*

Lot 7 "June 1, 1971"
Lot 8 "Jan 25 - 71"
Lot 10 "Paid off" [1]

On the face of the note, therefore, it was indicated that 10 of the 18 lots had been "Paid."

Between June 4, 1971, when the note was endorsed to Madison, and November 9, 1972, when Madison assigned the note to Title, the following notations appear in regard to payment for the lots on the face of the note:

*Block S*

Lot 14 "paid 9/21/71"
Lot 15 "Paid 11/16/71"

*Block T*

Lot 6 "11/5/71"
Lot 9 "Aug. 19, 1971"
Lot 11 "4/11/72"
Lot 12 "4/11/72"

The notations in ink entered after June 4, 1971, are in a different handwriting from those made before that date.

It will be observed then that prior to the endorsement of June 4, 1971, it was indicated on the face of the note that 10 lots had been paid for. On June 1, 1971, Check No. 1006 was drawn by Clark-King on its Madison bank account to the order of Lumsden in the amount of $10,664.00 marked for

---

[1]. Although this notation is undated, there is in the record a Check No. 1005, dated June 1, 1971, for $1,333.00 drawn to the order of Lumsden by Clark-King on the Madison National Bank and marked for "Release Lot 10, Bk T." Presumably, the notation "Paid off" was entered on the note prior to the assignment.

"Release of Lots 6, 9, 11, 12, 13, Bk T — 14, 15, 16 (S)," which was to pay off the remaining eight lots allegedly not theretofore paid off. Although the check was cashed by Lumsden, no releases for the eight lots were given.

There was some question in regard to whether, in fact, seven or eight lots were used as collateral for the new obligation with Madison. The testimony, however, indicates that a maximum of $14,000.00 was claimed by Madison and the trustees. Indeed, in the affidavit of indebtedness, the trustees claimed that $14,000.00 was due on the September 17, 1968, note, indicating seven lots were subject to payments of $2,000.00 each.

Subsequent to the endorsement of June 4, 1971, Madison followed the same basic practice for payment and release of the lots as existed when it acquired the note of September 27, 1968, except that it entered into an *oral* agreement with Clark-King that thereafter payments would be $2,000.00 for the release of each lot rather than the $1,333.00 as provided in the deed of trust. Clark-King does not contend that the oral modification of the deed of trust was not made and, indeed, made future payments of $2,000.00 per lot in accordance with the oral agreement. There were, accordingly, seven lots covered by the deed of trust to be individually paid off and released by the payment of $2,000.00 each, a total of $14,000.00.

The record establishes, in our opinion, that, prima facie, seven payments were made to Madison prior to its assignment to Title of $2,000.00 each for the release of all of the remaining lots and the payment of the September 27, 1968, note in full.

These payments were as follows:

August 19, 1971, Check #7022, Bank of Bethesda, Lot 9, Bk. T          $ 2,000.00
(Notation on face of note: "Aug. 19, 1971")

November 4, 1971, Check #2145, Chevy Chase Bank, Lot 6, T          2,000.00
(Notation on face of note: "11/5/71")

| | |
|---|---:|
| November 15, 1971, Check #2180, Chevy Chase Bank, Lot 15, S<br>(Notation on face of note: "Paid 11/16/71") | $2,000.00 |
| April 7, 1972, Check #2487, Chevy Chase Bank, "Pay off loan"<br>(Notation on face of note for Lot 12, T "4/11/72") | 2,000.00 |
| April 7, 1972, Check #7543, Bank of Bethesda, "Pay off loan"<br>(Notation on face of note for Lot 11, T "4/11/72") | 2,000.00 |
| September 17, 1971, Check #1975, Chevy Chase Bank, "Curtail Lumsden note"<br>(No notation on face of note) | 2,000.00 |
| September 13, 1972, Check #7789, Bank of Bethesda, Lot 13, T | 2,000.00 |
| (No notation on face of note)  Total | $14,000.00 |

Although there was no notation on the face of the note indicating the payment for the release of the two lots remaining unreleased, the notation "Curtail Lumsden note" on the September 17, 1971, check indicates, prima facie, that the debtor intended that the $2,000.00 — the same as the other releasing payments — should apply to one of these lots, and at least towards payment of the Lumsden note.

There was also no notation on the face of the note indicating the payment of September 13, 1972, for the release of Lot 13, Bk. T for $2,000.00. It is clear that this payment was received by Madison as the check is marked paid on November 10, 1972. The balance due on the September 27, 1968, note was then only $2,000.00, giving effect to the prior payments mentioned, so that this payment — designating the release of a specific lot — paid the note in full. The appellees contended that inasmuch as the check was not paid by the drawee bank until one day after the date of the assignment of November 9, 1972, to Title, no allocation could be made upon the September 27, 1968, note. However, Madison was put on notice of the final payment when the

September 13, 1972, check with the notation, "To Release Lot 13 (T) Potomac Woods" was delivered. Its holding of the check for almost two months will be deemed to have been an acceptance of the check for the indicated purpose, particularly when it is ultimately paid, albeit paid one day after the date of the assignment of the note to Title. The original check was apparently not available as an exhibit, and the record only contains a photostatic copy of the face of the check and not of its back. It may well be that the endorsement of Madison was prior to November 10, 1972, the date of the payment stamp.

Giving effect to this last $2,000.00 payment specifically allocated to the payment of the September 27, 1968, note by the notation on the check, the note was paid in full, so that neither Title nor Meneely received any claim on the note by virtue of their respective assignments.

An examination of the releases of specific lots covered by the deed of trust both by Lumsden and by Madison indicates that the debtor was indeed designating that the payments be allocated towards the note of September 27, 1968. It should be kept in mind that the deed of trust provided that the trustees were directed to release the lots "upon payment" of $1,333.00 "per lot to the noteholder."

The partial releases introduced into evidence comply with this provision of the deed of trust. The partial release of Lot 23, Block R, dated June 11, 1969, duly executed by the trustees and recorded on July 17, 1969, recites that Lot 23, Block R is "fully released and discharged from the effect and operation of said Deed of Trust, *the promissory note secured thereby having been paid and satisfied to the extent necessary to warrant release of the above property.*" (Emphasis supplied) To the same effect is the partial release dated October 20, 1969, for Lot 26, Block R, which the noteholder Lumsden endorsed in the margin "Release approved" with his signature. The partial release for Lots 24 and 25 in Block R, dated April 24, 1970; for Lot 11 in Block S, dated in July, 1970; for Lot 12, Block S, also executed in July, 1970; for Lot 8, Block T, dated January 20, 1971; and for Lot

13, Block S, dated April 21, 1971 — all executed before the endorsement of June 4, 1971 — are to the same effect.

A consideration of some of the partial releases subsequent to the endorsement of June 4, 1971, are also helpful as indications of certain allocation of payments towards the September 27, 1968, note.

The first partial release after the endorsement is dated August 23, 1971, for Lot 9 in Block T. It is in the same form as used prior to the endorsement and recites that the "promissory note secured thereby [has] been paid and satisfied to the extent necessary to warrant release of the above property." Madison, as noteholder, wrote in the margin "THIS RELEASE HEREBY APPROVED." This partial release was duly recorded on November 2, 1971. $2,000.00 was paid to Madison for this release by Check No. 7022 marked "Lot 9, Bk T, Potomac Woods" and on the face of the note, the notation "Aug. 19, 1971" was connected to Lot 9 by a line and a circle in ink.

The partial release dated November 15, 1971, for Lot 6 in Block T also recites that "the promissory note secured thereby having been paid and satisfied to the extent necessary to warrant release of these lots [sic]." In the margin is a notation by Madison, dated November 5, 1971, that "This Release is hereby authorized and approved." As already stated, Check #2145 payable to Madison in the amount of $2,000.00 was dated November 4, 1971, with the designation "to rel 6(T)." It was paid on November 5, 1971, by the Chevy Chase Bank and Trust Company, the drawee bank. On the face of the note is the notation "11/5/71" with a circle in ink around Lot 6, Block T and a connecting ink line to the date mentioned.

In the partial release for Lot 15 in Block S, a somewhat different form of release was used. The words "the debt secured thereby having been sufficiently reduced to permit this partial release. These trustees reserving unaltered and unimpaired the lien of said trust as to other property included therein and not hereby or heretofore released of record" are used. This partial release resulted from a

payment of $2,000.00 to Madison by Check #2180, dated November 15, 1971, with the notation "Release Lot 15, Blk S, Potomac Woods." On the face of the note is the connected notation "Paid 11/16/71" to Lot 15, Block S.

The partial release dated April 12, 1972, for Lots 11 and 12 in Block T is identical in form and basic language to that used in the partial release of November 15, 1971. That partial release resulted from two payments of $2,000.00 each to Madison by Checks Nos. 2487 on the Chevy Chase Bank and 7543 on the Bank of Bethesda, both dated April 7, 1972 — each check having the notation "pay off loan." On the face of the note, Lots Nos. 11 and 12 in Block T have the same connected notation "4/11/72."

The appellees purport to see a significant difference between the language "paid and satisfied" in the first two Madison partial releases and "debt secured reduced" in the last partial releases executed by it. We see no real difference. The "debt secured" is evidenced by the promissory note and in *each instance* Madison indicated the payment on the face of the note itself. In short, Madison treated the payments as payments on the note itself and as thereby releasing the lots secured by the deed of trust. The partial releases executed by Madison are consistent with the designation by the debtor Clark-King to apply the payments to the September 27, 1968, note. Madison even used the same format and basic forms as were previously used by Clark-King and Lumsden in designating the allocation of payments to that note.

Melvin L. Clark, Jr., president of Clark-King, testified that he understood that Madison would release each lot upon payment of $2,000.00 and that the September 28, 1968, note had been paid in full.

It should be observed that the evidence submitted by the exceptants showing, prima facie, a designation by the debtor that the payments be allocated to the September 28, 1968, note was not rebutted by the trustees who did not come forward with any contrary evidence. Indeed, the new note executed on or about June 4, 1971, for $24,000.00 by

Clark-King to Madison was never introduced into evidence so that the inference may properly be drawn that this note would be adverse to the case of the appellees. *See Hoverter v. Director,* 231 Md. 608, 188 A. 2d 696 (1963); *Maszczenski v. Myers,* 212 Md. 346, 129 A. 2d 109 (1957); Annot. 70 A.L.R. 1326 (1931). *See also NLRB v. Evans Packing Co.,* 463 F. 2d 193, 197 (6th Cir. 1972); McCormick, *Evidence* § 272 (2d ed. 1972); 2 Wigmore, *Evidence* § 285 (3d ed. 1940).

We thus have the situation in which the September 27, 1968, note shows application of payments on its face, supported in part by the partial releases themselves, and yet the 1971 note upon which Madison would apparently seek to apply the payments is not introduced into evidence!

The trial court found that there had been an oral agreement between Clark-King and Madison to increase the payment per lot for a partial release from $1,333.00 to $2,000.00, but found that there had been no agreement between the parties in regard to the allocation of the payments. The lower court was of the erroneous opinion, as we have observed, that in the absence of an agreement of the parties in regard to allocation, the *creditor* had the right to make the allocation, rather than the debtor. In this, the trial court was clearly in error and it also erred in not finding that the promissory note of September 27, 1968, had been fully paid by the proper allocation of payments, as we have pointed out above, and in not sustaining the exceptions to the sale for this reason.

The trustees under the deed of trust of September 27, 1968, should execute appropriate documents indicating that the deed of trust has been fully paid and satisfied so that this may appear of record.

We do not find it necessary to pass upon the other exceptions urged by the appellants in regard to the insufficiency of the advertisement of sale, the alleged gross inadequacy of the purchase price and the alleged fraudulent nature of the affidavit of indebtedness. Nor, of course, do we indicate any opinion in regard to what rights, if any, Title or Meneely, as assignees, of the promissory note and deed of

trust of September 27, 1968, may have against Madison or any other persons or corporations.

*Final order of ratification of March 9, 1973, reversed and the case remanded to the Circuit Court for Montgomery County for the passage of an order in accordance with this opinion, sustaining the exceptions filed by Clark-King Construction Company, Inc. and Peter C. Andresen to the foreclosure sale, declaring that sale to be null and void, dismissing the foreclosure proceedings with prejudice and requiring Floyd A. Meneely, the alleged secured party under the deed of trust of September 27, 1968, to pay the costs in the Circuit Court for Montgomery County. The appellees to pay the costs in this Court, without prejudice to any right of reimbursement they may have against Floyd A. Meneely or others.*